MARK MILLER, Florida Bar #0094961
Lead Counsel
PACIFIC LEGAL FOUNDATION
4440 PGA Blvd., Suite 307
Palm Beach Gardens, Florida 33410
Telephone: (561) 691-5000
mmiller@pacificlegal.org

CHRISTOPHER M. KIESER
Cal. Bar #298486
PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
ckieser@pacificlegal.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF INDIANA

## HAMMOND DIVISION

| | | |
|---|---|---|
| RANDALL PAVLOCK, KIMBERLEY PAVLOCK, and RAYMOND CAHNMAN, | ) ) ) | No. 2:19-cv-00466-TLS-APR |
| Plaintiffs, | ) ) | **FIRST AMENDED** |
| v. | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| ERIC J. HOLCOMB, in his official capacity as Governor of the State of Indiana; CURTIS T. HILL, in his official capacity as Attorney General of the State of Indiana; CAMERON F. CLARK, in his official capacity as Director of the State of Indiana Department of Natural Resources; and TOM LAYCOCK, in his official capacity as Acting Director for the State of Indiana Land Office, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

1.  Lake Michigan's Indiana beachfront is a beautiful natural resource, home to the Indiana Dunes National Park (the "National Park"), the State's first and only national park. The public may enjoy the beach at the National Park, the adjoining Indiana Dunes State Park (the "State Park"), and several other public beaches along the approximately 45 miles of Lake Michigan shoreline in Indiana.

2.  The public shares Indiana's Lake Michigan shoreline with private property owners. Lakefront owners have great incentive to preserve their private beach bordering the lake so that they and their families can continue to enjoy Lake Michigan's natural beauty. They paid for that beach and their deeds reflect as much.

3.  In February 2018, however, the Indiana Supreme Court effectively held that these lakefront owners never owned the beach despite their deeds and despite undisputed local, state, and federal acknowledgement over the years. In *Gunderson v. State*, 90 N.E.3d 1171 (Ind. 2018), the court held the State of Indiana has held exclusive title to the shore of Lake Michigan up to the ordinary high water mark (OHWM) since it became a state in 1816.

4.  Contrary to statements made by that court in its opinion, the *Gunderson* judgment changed the law of the State of Indiana, as recognized by prior Indiana court precedent as well as federal, state, and local authorities. Before *Gunderson*, these authorities all recognized, without any serious dispute, that lakefront owners could own the beach below the OHWM. In *Gunderson*, the Indiana Supreme Court

*First Amended Complaint* - 2

effectively moved the property line. The state supreme court's judgment constituted a taking of private property without any compensation, let alone just compensation.

5.   Plaintiffs are the owners of Lake Michigan lakefront parcels in the Town of Porter, Indiana. They were not parties to the *Gunderson* case. They are inholders within the boundaries of the National Park. The *Gunderson* decision effectively took their private beach and transferred it to the State. Plaintiffs Randall and Kimberley Pavlock and Raymond Cahnman hold deeds describing property that includes the beachfront below the OHWM. Indeed, their platted deeds show parcels going beyond the water's edge even in years where the lake is not at close-to-record levels.

6.   Plaintiffs recognize, of course, that the public has trust rights in the waters of Lake Michigan. But they dispute *Gunderson*'s core holding: that Indiana has always held *absolute title* up to a hard-to-define point known as the OHWM. *Gunderson* was not an uncontroversial statement of Indiana law, but a radical change that worked a taking of Plaintiffs' beachfront private property without any compensation.

7.   The Indiana General Assembly then codified that radical change, passing legislation that adopted the rule of *Gunderson*. The General Assembly had the opportunity to provide compensation for the taking *Gunderson*'s decree effected, but failed to do so. Instead, House Enrolled Act (HEA) 1385 adopted the *Gunderson* court's position that Plaintiffs never owned the property described in their deeds. Since neither legislatures nor courts can transfer private property to the public

*First Amended Complaint* - 3

without compensation, neither the *Gunderson* decree nor the challenged portions of HEA 1385 can stand.

**JURISDICTION AND VENUE**

8.   This action arises under the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment. This Court has jurisdiction through 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

9.   Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), actions against state officials seeking prospective injunctive relief are not barred by sovereign immunity.

10.   As explained in *Gunderson*, the State of Indiana now for the first time maintains that it owns absolute title from the "low water mark" on the shoreline of Lake Michigan up to the OHWM. Indiana has now codified that result. Plaintiffs, on the other hand, maintain that they own the property described in their deeds, including the land below the OHWM, down to Lake Michigan's "low water mark," unless and until they receive just compensation for the *Gunderson* taking.  Therefore, a present and concrete controversy between the parties exists.

11.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2). Defendants reside within this District and the property subject to this action is situated here.

## PARTIES

### Plaintiffs

12.  Plaintiffs Randall and Kimberley Pavlock (the Pavlocks) are the fee simple owners of two parcels along the shoreline of Lake Michigan in Porter County, Indiana. Their deeds are attached as Exhibits A and B, and incorporated herein by reference. These properties are platted and legally described as Lots 13-23 in Block 13 and the east 50 feet of Lots 11-15 in Block 14 of the Lake Shore Addition to the New Stock Yards, as shown in Plat File 17-1-A at the Porter County Recorder's Office. The Plat File is attached as Exhibit C and incorporated herein by reference. The deeds describe property that at all relevant times have included part of Lake Michigan covered by water, as well as significant property between the low water mark and the OHWM. It is this property, including the dry beach between the OHWM and the water's edge at any given time, that the *Gunderson* decision transferred to the State without compensation.

13. The Pavlocks are among a group of inholders in the Town of Porter, Indiana, whose properties are surrounded by the National Park. The lakefront setting makes the Pavlocks' property, including the previously private beach, ideal for recreation with family, friends, and neighbors. The *Gunderson* court took away this private beach from the Pavlocks, who no longer may exclude persons who use their formerly private property for recreation. In fact, by transferring the Pavlocks' property below the OHWM to the State, the *Gunderson* court put the Pavlocks in the same position as any member of the public *on their own beach*.

*First Amended Complaint - 5*

14. Plaintiff Raymond Cahnman (Cahnman) is the fee simple owner of one parcel along the shoreline of Lake Michigan in Porter County, Indiana. Cahnman has held this property since 2006 and, like the Pavlocks, is an inholder situated within the boundaries of the National Park. Cahnman's deed, attached as Exhibit D and incorporated herein by reference, is also platted. The legal description includes Lots 11-19 of Block 11 of the Lake Shore Addition to the New Stock Yards, shown in the Plat File attached as Exhibit C. This property includes land currently and historically covered by the water of Lake Michigan, as well as the dry beach.

15. Since Cahnman acquired the Porter beachfront property, he has used his previously private beach for recreation with family and friends, often exercising his right to exclude beachgoers who remain on his property. The *Gunderson* court took away this private beach from Cahnman, who no longer may exclude persons who use his formerly private property for recreation. In fact, by transferring Cahnman's property below the OHWM to the State, the *Gunderson* court put Cahnman in the same position as any member of the public *on his own beach*.

**Defendants**

16. Defendant Eric J. Holcomb is the Governor of Indiana. He is charged with enforcing the laws of the State of Indiana, which include the public trust doctrine, the *Gunderson* decision, and the legislation referenced above. He is sued in his official capacity.

17. Defendant Curtis T. Hill is the Attorney General of Indiana. Like the Governor, he also is charged with enforcing the laws of the State of Indiana, which

*First Amended Complaint - 6*

include the public trust doctrine, the *Gunderson* decision, and the legislation referenced above. He is the State's chief legal officer and is sued in his official capacity.

18. Defendant Cameron F. Clark is the Director of the Indiana Department of Natural Resources (DNR), which manages the Lake Michigan Coastal Zone and is directly responsible for administering the State's trust property in this area. He is sued in his official capacity.

19. Defendant Tom Laycock is the Acting Director for the Indiana State Land Office, which serves as the repository for deeds and plats of land previously or currently owned by the State. He is sued in his official capacity.

## HISTORY OF SHORELINE OWNERSHIP

20.  Indiana was admitted to the Union in 1816 on equal footing with then-existing states. At this time, much of what would become Porter County was unsettled.

21.  Porter County was established in 1836 out of neighboring LaPorte County. Lake Michigan forms Porter County's northern boundary.

22. In 1837, the United States began issuing land patents to private individuals in Porter County. The General Land Office issued a total of 2,638 patents for land in Porter County. None of the land in the County was privately held before Indiana became a State.

23. That same year, the Indiana Supreme Court decided *Stinson v. Butler*, 4 Blackf. 285 (1837). In that trespass action, the court rejected the argument that the

boundary between public and private lands along the Ohio River was the high water mark. Instead, the court held that private owners along navigable non-tidal water in Indiana "must be considered as *owning the soil to the ordinary low-water mark.*" *Id.* at 285. The Indiana Supreme Court reaffirmed this rule several times in the nineteenth century. *See Martin v. City of Evansville*, 32 Ind. 85, 86 (1869) (property owners own to the low water mark of the Ohio River "subject only to the easement in the public of the right of navigation"); *Sherlock v. Bainbridge*, 41 Ind. 35, 41 (1872) (describing this rule as a "settled . . . rule of property" established "as far back as 1837, and continuing in an unbroken series down to the present day").

24.   Those courts did not distinguish between the waters of the Ohio River to the south and Lake Michigan to the north; to the contrary, the *Stinson* court rejected one party's reliance on the common law rule of ownership to the high water mark because the waters of the Ohio River are "non-tidal." *Stinson*, 4 Blackf. at 285. Like the Ohio River, the waters of Lake Michigan are non-tidal.

25.   Upon information and belief, in 1891, Orville Hogue of Chicago platted approximately 100 acres at what would become Porter Beach. He called the section the Lake Shore Addition to the New Stock Yards, apparently to entice Chicago residents to buy one of the several hundred 100' by 25' lots he had platted. Exhibit C depicts the Lake Shore Addition.

26.   Upon information and belief, the Lake Shore Addition attracted buyers, but many were apparently upset when they discovered that the land was nowhere near the Chicago stockyards. Many property owners simply abandoned their lots.

*First Amended Complaint* - 8

Many lots were auctioned by Porter County in tax sales. Quiet title suits continued to settle disputes over the Hogue lots until 1962.

27.  Today, many of these lots are entirely below any potential definition of the OHWM. Nevertheless, individuals hold title to these lots and many have been assessed with significant value in years where the lake uncovers them.[1]

28.  Many other lots, such as those owned by Cahnman and the Pavlocks, are partially submerged on a near-permanent basis, even when the water reaches historic low points. These parcels include significant portions of dry beach, especially when the lake is at low points. Even when the lake is high, as it currently is, the parcels include dry sand beach below the OHWM. Before *Gunderson*, this was private beach encumbered by a walking easement granted to the federal government for the benefit of the general public. *See infra* ¶¶ 31-34.

29.  The deeds for the Pavlock and Cahnman beachfront parcels indicate that the bounds of these parcels include property below the OHWM and, indeed, below the water's edge. The amount of uncovered dry beach varies with the lake levels. *See* Exhibits A, B, C, D.

30.  In 1966, Congress passed legislation providing for the creation of a National Lakeshore ("Lakeshore") along Lake Michigan, including Porter County. Pub. L. No. 89-761, 80 Stat. 309 (1966). As a result, the United States for the next

---

[1] Two such parcels are 64-03-14-251-002.000-026 and 64-03-14-251-003.000-026. The first parcel, owned by Daniel Wilson, has been assessed at a nominal value each year ($600 in 2019), except at $10,100 in 2013. *See* http://search.portercountyassessor.com/parcel.php?id=64-03-14-251-002.000-026 (last visited Apr. 8, 2020). The second, owned by Carole E. Coslet, tells a similar story—assessed at a nominal value each year ($500 in 2019) except in 2013 ($9,400). *See* http://search.portercountyassessor.com/parcel.php?id=64-03-14-251-002.000-026 (last visited Apr. 8, 2020). These parcels are currently almost entirely—if not entirely—submerged.

several years acquired private property where the Lakeshore was to be located. *See infra* ¶ 36, *et seq*. But by the late 1970s, the federal government was running short on funds to purchase additional land.

31. In the alternative, the federal government instead sought easements to permit the public to walk on the Lake Michigan shoreline between the National Park (then Lakeshore) and the State Park, as well as along some still-private beach within the Lakeshore's boundaries.

32. Certain property owners conveyed to the United States easements "for the purpose of providing the general public a means to traverse on foot along a portion of the shores of Lake Michigan."

33. These property owners included the Pavlocks (Exhibit E), Cahnman's predecessor-in-interest Reynolds (Exhibit F), several other private property owners—Brandstetter (Exhibit G), Bremer (Exhibit H), Deters (Exhibit I), and Savage (Exhibit J)—as well as the Town of Dune Acres, situated immediately to the west of Porter Beach (also Exhibit J). These easements refer to lots described in Exhibit C. These lots—owned by private parties and the Town of Dune Acres—include significant property below the "high-water line," the "toe of the dunes," and the water's edge, all of which are defined based on a 1979 survey depicted on Exhibit C. The easements expressly exclude the part of each lot "lying Southerly of the 'toe of the dunes'" as that term is defined in the 1979 survey and depicted on the Plat. Exhibits E, F, G, H, I, J. In other words, the walking easements refer to property lakeward of the "toe of the

dunes," to the 1979 water's edge and beyond. Yet the *Gunderson* court declared that Indiana had always owned much of this property.

34.  Under the terms of the easements, the United States assumed a duty to keep the easement "reasonably clean and free of debris." *Id.* The grantors, including the Pavlocks and Cahnman's predecessors-in-interest, explicitly reserved all rights in the property other than walking. Indeed, the easements made sure to state that the public had no rights to loiter, picnic, or fish on the beach. *Id.*

35.  The United States separately negotiated with Indiana for rights in the first 300 feet of Lake Michigan. *See* 43 Fed. Reg. 2240, 2241 (Jan. 10, 1978); Letter from Indiana Gov. Otis Bowen to Pres. Gerald Ford, Sept. 30, 1976 (approving and endorsing House Report 1145, a House Report on the bill extending the boundaries of the National Park (then the National Seashore) to 300 feet of Lake Michigan, https://www.fordlibrarymuseum.gov/library/document/0055/1669685.pdf, page 10 of PDF; and Senate Report 94-1189, dated August 30, 1976, a companion to that House Report, explicitly endorsing extension of National Park into the first 300 feet of Lake Michigan, also available at same internet link beginning at page 34). The existence of the easements and the agreement with Indiana as to the management of the waters of Lake Michigan demonstrate that all parties understood that private property owners could own the beach below the OHWM.

36.  In 1987, Ron Cockrell of the U.S. National Park Service authored a text that is now also available online, entitled *A Signature of Time and Eternity: The*

*Administrative History of Indiana Dunes National Lakeshore, Indiana*,[2] describing the history of how the Lakeshore (now National Park) came into existence. The book is replete with evidence that the federal government, state government, and local governments along the shore all accepted as true—for the entire twentieth century—that private individuals could own the Lake Michigan beaches to the low water mark.

37. Likewise, a non-fiction account[3] of the history of the National Lakeshore was published by the University of Illinois Press in 1983. Like the *NPS Administrative History*, *Duel for the Dunes* detailed how much of the shoreline in Indiana was privately held for the most part and how a portion of that private beach became part of the Lakeshore.

38. Both of these works document the historical reality that private landowners held title to the beach of Lake Michigan for almost two centuries before the *Gunderson* court declared—for the first time in the history of the State—that the State had in fact always owned it.

39. For example, in 1915-16, future National Park Service Director Stephen T. Mather noted that land acquisition of "a strip of lakeshore twenty-five miles long and one mile wide" would cost between $1.8 and $2.6 million. *NPS Administrative History* at Chapter 1. He continued:

---

[2] Ron Cockrell, *A Signature of Time and Eternity: The Administrative History of Indiana Dunes National Lakeshore, Indiana* (U.S. Dep't of Interior 1988), *available at* the Porter County Public Library in Valparaiso, Indiana, *and online at* https://www.nps.gov/parkhistory/online_books/indu/adhi.htm) [hereinafter *NPS Administrative History*]. The online version includes all materials cited herein within sub-links available at that first link given above.

[3] Kay Franklin & Norma Shaeffer, *Duel for the Dunes: Land Use Conflict on the Shores of Lake Michigan* (1983) [hereinafter *Duel for the Dunes*].

*First Amended Complaint* - 12

"Here is a stretch of unoccupied beach 25 miles in length, a broad, clean, safe beach, which in the summer months would furnish splendid bathing facilities for thousands of people at the same instant. Fishing in Lake Michigan directly north of the dunes is said to be exceptionally good. There are hundreds of good camp sites on the beach and back in the dunes."

*Id.* Had the State held title to the beach since 1816, Mather would not have had to speculate about the cost to acquire it.

40.  Such an effort was necessary because—as *Duel for the Dunes* recognizes— "The land under consideration [for conservation] stretched twenty-five miles from Gary to Michigan City, and all of it belonged to private owners." *Duel for the Dunes* at 32. Conservationists tried to find private purchasers, but "became convinced that only governmental purchase could ensure success." *Id.*

41.  In 1918, a newspaper columnist wrote: "Unless the State of Indiana or the United States takes the matter in hand, commercial plants will crowd the entire lake frontage." *NPS Administrative History* at Chapter 1. Commercial plants would have had no authority to crowd the lake if the State held absolute title up to the OHWM. But the State did not. U.S. Steel owned and developed lakefront property in Gary, Indiana, beginning in the early 1900s. This development is documented in Indiana University's U.S. Steel Photo Collection,[4] examples of which are pictured below. Both U.S. Steel in Gary and Northern Indiana Public Service Company (NIPSCO) in Michigan City continue to own lakefront property on Lake Michigan in Indiana. The *Gunderson* court ignored this historical reality.

---

[4] *Available at* http://webapp1.dlib.indiana.edu/ussteel/index.jsp (last visited Apr. 8, 2020).







42. Significant land acquisition allowed the State to create the State Park just to the east of what is now the National Park. As explained in *Duel for the Dunes*, "[i]n 1927 the State of Indiana gobbled up three miles of Porter County lakefront for the State Park, removing them from the tax rolls and making them perpetually unavailable for industrialization." *Duel for the Dunes* at 53. Much of this land was dry beach below the OHWM, which the *Gunderson* court declared in 2018 that the State had already owned. This history documents that buyers and sellers in 1927 had a contrary understanding to that expressed by the Indiana Supreme Court in *Gunderson* as to who owned the dry beach below the OHWM.

43. In the 1950s, the Governor of Indiana proposed a harbor for ocean-going ships between Ogden Dunes and Dune Acres, and the state legislature approved funding to buy 1,500 acres at Burns Ditch. Burns Ditch sits on the waterfront and, if

owned by the State of Indiana, then the purchase of at least a portion of these 1,500 acres was superfluous. *NPS Administrative History* at Chapter 2.

44.   In 1958-59, a bill was developed to create the Lakeshore. This Lakeshore would exclude the towns of Dune Acres, Ogden Dunes, and Johnson Beach because it was understood that those towns or private property owners within those towns owned those beaches, but otherwise the national Lakeshore was to include "unspoiled" areas of Johnson Beach. *NPS Administrative History* at Chapter 2.

45.   Around this same time, Midwest Steel began building again at Burns Ditch and NIPSCO started a coal plant west of Dune Acres. Again, neither Midwest Steel nor NIPSCO purchased the beach from the State of Indiana for these plants—because the State did not own the beach at these locations (or any other). *Id.*

46.   To the contrary, as detailed in *Duel for the Dunes*, "[i]n 1958, the year [U.S. Senator Paul] Douglas introduced his first Dunes bill (S3898), a little less than half of Porter County's total shoreline remained undeveloped and in private ownership. The principal site, called the Central Dunes, lay between the towns of Ogden Dunes and Dune Acres. It consisted of four-and-three quarters contiguous miles of beach and high dunes considered by conservationists as the most desired parcel in the entire Dunes region for preservation. Midwest Steel, Bethlehem Steel, and [NIPSCO] divided its ownership." *Duel for the Dunes* at 159.

47.   In 1960, a U.S. Army Corps of Engineers report recommended building a harbor at Burns Ditch. "The report called for dredging the lake approach channel to a depth of thirty feet and the outer harbor to twenty-seven feet." *NPS Administrative*

*History* at Chapter 3. A 1930 Corps report had actually opposed a harbor on the grounds that it would "be entirely surrounded by the plant of the Midwest Steel Corporation, which would make its use by the general public impracticable." *Id.* Again, if the State owned the beach, then Indiana—not Midwest Steel—would have owned the beach at Burns Ditch.

48.  In 1963, compromise bills were introduced in Congress to create a national lakeshore and a harbor at Burns Ditch. *Id.* The lakeshore would be in four distinct units, a total of 8.75 miles, excluding Burns Ditch and the Bethlehem Steel area. *Id.* But this effort was blocked by opposition from local politicians and the steel companies. *Id.* There is no discussion in the *NPS Administrative History* that this beach was already state-owned.

49.  In 1966, after Congress approved a bill to create the Indiana Dunes National Lakeshore, the Department of Interior commissioned a report on the area. *Id.* at Chapter 4. The report provided that the State of Indiana only owned a quarter of the area marked for the National Lakeshore, and that the beach held by beachfront owners, including the Bethlehem Steel and National Steel mills, would have to be purchased for an estimated $23 million. *Id.*

50.  To further underscore that the public and the government understood that the beach could be privately owned, opponents of the creation of Indiana Dunes National Lakeshore inserted Ogden Dunes beach into the proposed National Lakeshore; this was done because, according to Cockrell and the *NPS Administrative History*, opponents "were convinced that [park supporters] were interested in

protecting the private beaches of their communities." *Id.* Those park supporters, who were members of the same Save the Dunes organization that intervened in the *Gunderson* litigation, said (by way of Save the Dunes member Herbert Read): "We had a Save the Dunes Council Board meeting and unanimously passed a resolution in support of including not only the Ogden Dunes beach, but all the remaining privately owned beaches as well." *Id.* Since the 1960s, Save the Dunes appears to have changed its approach, as it now contends (as it did in *Gunderson*) that much of this beach has *always* been state-owned.

51. In 1966, the bill to create the Lakeshore passed, and Congress appropriated $28 million and designated 8,100 acres to create the Lakeshore. *Id.* President Johnson himself described the bill: "The bill to establish the Indiana Dunes National Lakeshore has been 50 years in the making. In 1916, the National Park Service first cited the need to preserve for public use the strip of uninhabited, tree-covered dunes, and white sandy beaches stretching along the south shore of Lake Michigan from East Chicago to Michigan City." *Id.* There would have been no need for the federal government to preserve the beach for the public if the State of Indiana already owned the beach, as the *Gunderson* court inexplicably contended.

52. The *NPS Administrative History* notes that "[t]he park's legislative history indicates the Congressional subcommittees wanted an uninterrupted eleven-mile stretch of shoreline from the west end of Dune Acres to Michigan City upon which visitors would not trespass on private property. Whereas a series of dunes separated Lake Michigan from Ogden Dunes and Dune Acres, no barriers existed at Beverly

Shores. Homes appeared on the front line of dunes, some even were built over the beach. The boundary designation in the beach areas, 'from the toe of the dune to the water's edge,' was not feasible at Beverly Shores and therein lay the controversy." *Id.* at Chapter 5. The "controversy" was over which part of the shoreline NPS needed to acquire to ensure that "uninterrupted" stretch of beach and what to do with shoreline owners there. The solution was to permit owners to sell their homes and property to the government and reserve an occupancy right for 15 years. *Id.*

53. The conclusion of *Gunderson* was that these owners *never owned* much of the property that NPS wanted to acquire for the uninterrupted shoreline—between the toe of the dunes and the water's edge at any given time. But the historical record before and since demonstrates that *Gunderson* was simply wrong, and that private ownership to the low water mark has always been the case in Indiana, as explicitly held in the 1837 *Stinson* decision.

54. After President Johnson signed the bill to create the National Lakeshore, the federal government began buying private lots along the beach, including a 385-acre parcel owned by Inland Steel and 79 tracts (442 acres) in Porter. *Id.*

55. Disputes between private beachfront lot owners and the public in the bounds of the National Lakeshore erupted when the park opened. *Id.* at Chapter 6. In 1969, "[f]ollowing the lakeshore's acquisition of the West Beach unit, problems with trespass on the yet-to-be-opened public lands were prevalent. Numerous complaints from Ogden Dunes residents resulted in the Park Service contracting with the Portage Police Department to patrol the area," and later—in 1970—"signs were

needed in West Beach to mark the lakeshore boundaries clearly. Second, beach access for emergency and service vehicles was difficult for they had to cross two private tracts, the owners of which were hostile toward the lakeshore." *Id.*

56. By 1970, the nearly $28 million appropriated for land acquisition had been spent, but it was estimated that another $4 million might be needed. "As of August, we were projecting a total cost of $27,180,226 against a ceiling of $27,900,000. However, since then some of the [condemnation] cases tried have resulted in awards exceeding that set aside by some 495 percent. Whether this adversity will continue or not is most difficult to say since each enclave there represents a completely different situation." *Id.*

57. In 1971, a proposal was considered to expand the Lakeshore—"The Save the Dunes Council devoted intense scrutiny to the three populated 'islands' within the national lakeshore's boundaries: Dune Acres/Porter Beach, Ogden Dunes, and Beverly Shores. It decided to endorse inclusion of the 'Beverly Shores Island' over the other two for a number of reasons. Primarily because Beverly Shores had a lower population density per acre and had clearly outstanding natural values, the Council believed its inclusion could be justified before Congress more easily. Population density differed from town to town. Because three-quarters of the developed portion of Dune Acres was in its northeast quadrant, the 'empty' three segments were targeted for inclusion. On the other hand, Beverly Shores' population was scattered throughout its limits and no significant area could be acquired without claiming private homes." *Id.*

58. In 1975, the Ogden Dunes Home Association, Inc.—a collection of property owners in Ogden Dunes, Indiana—sold its beach to the Town of Ogden Dunes, which maintains ownership to this day. *See* Exhibit K.[5] By a 1974 Town resolution, Ogden Dunes declared that the "real estate commonly known as Ogden Dunes Beach," acquired from the Home Association, would be reserved "solely for the use and benefit of residents of the Town of Ogden Dunes and their guests." *Id.* Such exclusivity would of course be inconsistent with absolute State ownership below the OHWM. And Ogden Dunes could not own—and exclude non-residents from—property that the State purportedly owned since 1816. The *Gunderson* court simply failed to account for this historical reality when it rewrote Indiana property law.

59. In 1979, the NPS completed a Memorandum of Understanding with Ogden Dunes to provide for public access to the beach—beach that is otherwise privately-held by Ogden Dunes for the benefit of its residents, *see supra* ¶ 58. *NPS Administrative History* at Chapter 10. Ogden Dunes agreed to this MOU around the same time other property owners, including the Pavlocks, Cahnman's predecessors-in-interest, and the Town of Dune Acres, granted walking easements across their portions of the Lake Michigan beach. If the State of Indiana owned this beach, then the NPS would have negotiated *with the State* for these walking rights.

---

[5] "Parcel A" referenced in Exhibit K is shown on the plat attached at Exhibit L obtained from the Porter County Surveyor.

### The Effect of *Gunderson*

60. Because it was universally recognized that private owners like the Pavlocks and Cahnman owned the dry beach below the OWHM, there was little controversy over inholder beach ownership in the three decades following the grant of these easements to the United States.

61. That situation changed in 2010, when the town of Long Beach, Indiana, in neighboring LaPorte County, passed an ordinance purporting to declare that DNR's administrative high water mark of 581.5 feet above sea level established the boundary between public and private property. The Gundersons, lakefront owners in Long Beach (about 15 miles east of Porter), sued DNR and sought declaratory relief and to quiet their title down to the water's edge, where their deed indicated ownership.

62. Nevertheless, the Indiana Supreme Court held that Indiana has always maintained absolute title to the shore of Lake Michigan below the OHWM. While the court acknowledged its 1837 *Stinson* precedent, the court changed Indiana law when it concluded that this precedent did not apply to Lake Michigan.

63. Other state courts in the Great Lakes have followed *Stinson*'s distinction between tidal and non-tidal waters and applied it to Lake Michigan. For example, the Wisconsin Supreme Court explained the rule for non-tidal waters: "when nature in pursuance to natural laws holds in its power portions of the land which at periods of the year are free from flowage, then during such periods the strip referred to is subject to all the rights of the public for navigation purposes. On the other hand, when the

waters recede, these rights are succeeded by the exclusive rights of the riparian owner." *Doemel v. Jantz*, 193 N.W. 393, 398 (Wis. 1923). The Illinois Supreme Court rejected the OHWM as the boundary for a similar reason, writing that "[t]he portion of the soil which is only seldom covered with water may be valuable for cultivation or other private purposes. And the line at which it usually stands unaffected by storms and other causes, represents the ordinary high water mark on the ocean, and the point between the highest and lowest water marks produced by the tides." *Seaman v. Smith*, 24 Ill. 521, 524 (1860); *see also Glass v. Goeckel*, 703 N.W.2d 58, 93 (Mich. 2005) (Markman, J., dissenting) (noting that "the 'ordinary high water mark' is a term used to define the scope of the public trust doctrine in tidal waters" and criticizing the majority's "attempt to graft this tidal-based term upon the nontidal Great Lakes"). The Indiana Supreme Court later cited *Seaman* as an authority "upon the general subject of grants of lands bordering upon natural lakes." *State v. Portsmouth Sav. Bank*, 7 N.E. 379, 390 (Ind. 1886).

64. The *Gunderson* decision thus made Indiana the first Great Lakes bordering state to establish the OHWM on a Great Lake as the boundary between public and private property.[6]

65. By its terms, *Gunderson* applies to the entire shoreline of Lake Michigan in Indiana, so long as an individual's title does not predate statehood.

---

[6] While the majority of the Michigan Supreme Court in *Glass* adopted the OHWM as the boundary of the public trust lands on Lake Michigan in the State of Michigan, it held that private property could extend to the low water mark, encumbered by an extremely limited public easement below the OHWM. *See Glass*, 703 N.W.2d at 68-71 (majority opinion) (describing overlapping title between the low and high water marks) & 75 (describing the limited nature of public rights below the OHWM).

66. More than simply interpreting unclear state law, the *Gunderson* decision was an abrupt change in state law that unsettled Plaintiffs' property rights. The Indiana Supreme Court ignored not only its own precedent, but Indiana's history. Before *Gunderson*, all the relevant actors—private property owners, local governments, Indiana, and the United States—treated the dry beach below the OHWM as private property. *Duel for the Dunes* and the *NPS Administrative History* both document this real-time historical reality, as do historical photographs and the walking easements granted to the United States in 1979 and 1980. If the beach below the OHWM were exclusive property of Indiana, then the United States would not have purchased land or sought easements from private property owners to ensure public walking rights. Nor would local jurisdictions tax entirely submerged lots below the OHWM.

67. By moving the property line along the lake from the low water mark to the OHWM, *Gunderson* transferred private beach property to the State. This effected an uncompensated government taking of private property in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

### The Effect of House Enrolled Act 1385

68. On March 21, 2020, Defendant Governor Holcomb signed House Enrolled Act 1385, which goes into effect on July 1, 2020.[7] The Act declares that, with the exception of authorized legislative transfers before the date *Gunderson* was handed down, the State of Indiana owns the shoreline of Lake Michigan below the OHWM.

---

[7] The text of the law can be found here: http://iga.in.gov/legislative/2020/bills/house/1385#document-1b7a2d6e.

HEA 1385, § 57, *codified at* Ind. Code § 4-26-2.1-3(a) (in effect July 1, 2020). With respect to ownership, HEA 1385 essentially codified the *Gunderson* rule. Like *Gunderson*, HEA 1385 is contrary to the prior common law of Indiana, the common law of other Great Lakes States, and the history of coastal ownership along Lake Michigan.

69. HEA 1385 offers no compensation for private property owners like Plaintiffs who own property below the OHWM. Instead, like the *Gunderson* court, HEA 1385 takes the position that Plaintiffs never owned the property described in their deeds.

70. HEA 1385 also potentially broadens the scope of public use of the property below the OHWM. The Act permits the public to use the shore below the OHWM for walking, fishing, boating, swimming, and "[a]ny other recreational purpose for which Lake Michigan is ordinarily used, as recognized by the commission for the purposes of this section." HEA 1385, § 57, *codified at* Ind. Code § 14-26-2.1-4(b) (in effect July 1, 2020). *Gunderson* permitted only the traditional triad of commerce, navigation, and fishing, as well as transitory walking. *Gunderson*, 90 N.E.3d at 1188.

71. As a result of HEA 1385, even if Plaintiffs succeed in obtaining an injunction against enforcement of the *Gunderson* decision, the Defendants would still claim ownership over the disputed beachfront below the OHWM pursuant to HEA 1385.

72. If done independently, HEA 1385's declaration of ownership would constitute an uncompensated taking of Plaintiffs' property below the OHWM. Neither

*First Amended Complaint* - 25

legislatures nor courts may transfer private property to the public without compensation.

### First Cause of Action

### (Uncompensated Taking of Land Below Lake Michigan's OHWM)

73. Plaintiffs hereby re-allege each and every allegation contained in Paragraphs 1 through 72 as though fully set forth herein.

74. The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, prohibits the government from taking "private property for public use, without just compensation."

75. Defendants are charged with enforcing Indiana's property interests and law, including the public trust doctrine as expounded by the Indiana Supreme Court. They do so under color of state law within the meaning of 42 U.S.C. § 1983.

76. Defendants Governor Holcomb and Attorney General Hill are charged with the enforcement of the duly enacted statutes of the State of Indiana. Defendant Director Clark is charged with managing Indiana's Lake Michigan shoreline.

77. The U.S. Supreme Court has held that, consistent with the Fifth Amendment, "a State, by *ipse dixit*, may not transform private property into public property without compensation." *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 164 (1980). This holds true whether the state actor is the legislature, an administrative agency, a local government, or a court. *See id.*; *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection*, 560 U.S. 702, 713-15 (2010) (plurality opinion).

78. *Gunderson* transformed the established law by moving Plaintiffs'—and all other Indiana lakefront property owners'—property lines to the OHWM, irrespective of their deeds or titles. This change in established state law effected a taking of Plaintiffs' property, particularly their previously private dry beach.

79. If done independently, HEA 1385's declaration of State ownership below the OHWM would constitute an uncompensated taking in violation of the Fourteenth Amendment. Like the Indiana Supreme Court, the Indiana General Assembly cannot simply declare private property public without compensation. *Webb's Fabulous Pharmacies*, 449 U.S. at 164. The only reason HEA 1385's declaration of ownership did not decree an unconstitutional taking is because *Gunderson* had already done so.

80. Because Indiana is immune from suits for damages in federal court and the Indiana Supreme Court has already declared that a decree of State ownership below the OHWM is not a taking, Plaintiffs lack a remedy at law in either federal or state court. Therefore, Plaintiffs may seek declaratory and injunctive relief against the enforcement of *Gunderson*'s boundary and the ownership provision of HEA 1385 that codified it.

### Second Cause of Action

### (Uncompensated Taking of Expanded Easement Below Lake Michigan's OHWM)

81. Plaintiffs hereby re-allege each and every allegation contained in Paragraphs 1 through 72 as though fully set forth herein.

*First Amended Complaint* - 27

82.  The Fifth Amendment to the Constitution, made applicable to the states by the Fourteenth Amendment, prohibits the government from "taking private property for public use, without just compensation."

83.  Defendants Governor Holcomb and Attorney General Hill are charged with enforcing the duly enacted statutes of the State of Indiana. Defendant Director Clark, as Director of DNR, is directly charged with enforcement of the challenged portion of HEA 1385. All Defendants are acting under color of state law within the meaning of 42 U.S.C. § 1983.

84.  The U.S. Supreme Court has held on multiple occasions that even an easement may not be taken without just compensation. *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987).

85.  HEA 1385's definition of "recreational purpose" includes a broad catch-all provision that permits Indiana to expand the permitted public uses of the Lake Michigan shore below the OHWM.

86.  Should Plaintiffs prevail on their First Cause of Action, further expansion of public activities beyond the already-granted walking easements and, perhaps, the traditional public trust activities, would constitute the taking of an easement without compensation.

87.  This Second Cause of Action is conditional upon the success of the First Cause of Action. Should the Court reject Plaintiffs' First Cause of Action, Plaintiffs could no longer allege that expanding public rights to the shore constitutes an additional taking.

88. Because Indiana is immune from suits for damages in federal court, and the Indiana Supreme Court has already determined that Indiana will not compensate Plaintiffs, Plaintiffs lack any remedy at law and thus are entitled to seek injunctive and declaratory relief in federal court.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment from this Court as follows:

A.  An entry of judgment declaring that the Indiana Supreme Court's decision in *Gunderson v. State*, which purported to declare that lakefront owners could hold title only above the OHWM, effected an uncompensated taking of Plaintiffs' property below the OHWM, including the dry beach.

B.  An entry of judgment declaring that HEA 1385's provision declaring State ownership of Lake Michigan below the OHWM, essentially codifying the taking decreed in *Gunderson*, is also unconstitutional.

C.  An entry of a permanent injunction prohibiting Defendants and the State of Indiana from enforcing both the *Gunderson* decision and HEA 1385's provisions on ownership of Lake Michigan below the OHWM, thus prohibiting Defendants and the State from exercising ownership over the disputed property.

D.  An entry of a permanent injunction prohibiting Defendants from enforcing HEA 1385's expansion of public rights to the shore of Lake Michigan below the OHWM beyond the traditional public trust triad and transitory walking.

E.  An award of attorneys' fees and costs in this action pursuant to 42 U.S.C. § 1988.

F.   An award of any further legal or equitable relief this Court may deem just and proper.

DATED: April 9, 2020.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

By /s/ Mark Miller

| | |
|---|---|
| CHRISTOPHER M. KIESER | MARK MILLER |
| Cal. Bar #298486 | Fla. Bar #0094961 |
| PACIFIC LEGAL FOUNDATION | PACIFIC LEGAL FOUNDATION |
| 930 G Street | 4440 PGA Blvd., Suite 307 |
| Sacramento, California 95814 | Palm Beach Gardens, Florida 33410 |
| Telephone: (916) 419-7111 | Telephone: (561) 691-5000 |
| ckieser@pacificlegal.org | mmiller@pacificlegal.org |

*Attorneys for Plaintiffs*