UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

RANDALL PAVLOCK, *et al*.,      )
                           )
      Plaintiffs,        )
                           )
      v.             )   Case No. 2:19-CV-00466 JD
                           )
ERIC J. HOLCOMB, in his official   )
capacity as Governor of the State of  )
Indiana, *et al*.,         )
                           )
      Defendants.     )
                           )

## **OPINION AND ORDER**

This case arises from Plaintiffs Raymond Cahnman, Randall Pavlock, and Kimberley Pavlock's claim that the Indiana Supreme Court's decision in *Gunderson v. State*, 90 N.E.3d 1171 (Ind. 2018), resulted in a taking of private property in violation of the Fifth Amendment of the Constitution. The Amended Complaint asserts numerous claims against the Defendants Eric Holcomb, Governor of the State of Indiana; Curtis Hill, Attorney General of the State of Indiana; Cameron Clark, Director of the State of Indiana Department of Natural Resources ("DNR"); and Tom Laycock, Acting Director of the State of Indiana Land Office. [DE 37]. The Defendants have filed a motion to dismiss in which they argue that the Plaintiffs are precluded from asserting these claims against them due to sovereign immunity and due to the Amended Complaint failing to state a claim upon which relief can be granted. [DE 40].

## I.    **Factual Background**

The Plaintiffs are owners of beachfront property on the shores of Lake Michigan in the Town of Porter, Indiana. In 2018, the Indiana Supreme Court held in *Gunderson v. State*, 90 N.E.3d 1171 (Ind. 2018), that the State of Indiana has held exclusive title to the shore of Lake

Michigan up to the ordinary high water mark ("OHWM") since it became a state in 1816. The

Plaintiffs were not parties to the *Gunderson* case, but they hold deeds describing property that

includes beachfront property below the OHWM down to the water's edge.[1] The Plaintiffs

maintain that they own the property described in their deeds. Since the Indiana Supreme Court

held that Indiana has always held absolute title to the land below the OHWM, the plaintiffs assert

that the decision in *Gunderson* was a judicial taking of private property without just

compensation in violation of the Fifth Amendment.

In 2020, the Indiana General Assembly codified the *Gunderson* decision with the passage

of House Enrolled Act ("HEA") 1385. The Act states:

> (a) Absent any authorized legislative conveyance before February 14, 2018, the
> state of Indiana owns all of Lake Michigan within the boundaries of Indiana in trust
> for the use and enjoyment of all citizens of Indiana.
> (b) An owner of land that borders Lake Michigan does not have the exclusive right
> to use the water or land below the ordinary high water mark of Lake Michigan.

Ind. Code Ann. § 14-26-2.1-3 (West). The plaintiffs also assert that HEA 1385 broadens the

scope of public use of the property below the OHWM. The *Gunderson* decision only recognized

the "traditional triad" of commerce, navigation, and fishing in addition to transitory walking

along the shore below the OHWM. 90 N.E.3d at 1183. HEA 1385 expanded the public use to

also allow for boating, swimming, and "[a]ny other recreational purpose for which Lake

Michigan is ordinarily used, as recognized by the commission for the purposes of this section."

Ind. Code Ann. § 14-26-2.1-4(b) (West).

---

[1] The Court notes that one of the Plaintiffs in this case, Raymond Cahnman, was one of the Amicus Curiae in the state case and was represented by the same legal firm—the Pacific Legal Foundation—who now represents him in this case. In the state case, the Amicus Curiae Pacific Legal Foundation argued that Indiana should limit its public trust doctrine to three public uses recognized at common law (fishing, commerce, and navigation). Anything more, they argued, would constitute an unconstitutional taking.

The Plaintiffs are now seeking declaratory judgments against the Indiana Supreme Court's decision in *Gunderson* and HEA 1385 as well as permanent injunctions prohibiting the Defendants from enforcing the decision and HEA 1385's provisions. More specifically, the Plaintiffs are alleging the uncompensated taking of land below the OHWM via the *Gunderson* decision and the uncompensated taking of an easement via an expansion of the previous easement below the OHWM via HEA 1385. The Plaintiffs state that their second cause of action, based on the expanded easement established by HEA 1385, is conditional upon the success of its first cause of action—the takings claim. [DE 45 at 29]. The Defendants moved to dismiss the plaintiffs' complaint on Eleventh Amendment immunity grounds and for failure to state a claim upon which relief could be granted. For the following reasons, the Court grants the defendants' motion under Rule 12(b)(1) and 12(b)(6).

## I. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) authorizes the dismissal of claims over which this Court has no subject matter jurisdiction. In analyzing a motion to dismiss, the Court must accept as true all well-pled factual allegations and must draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The burden of establishing proper federal subject matter jurisdiction rests on the party asserting it, which in this case are the plaintiffs. *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010). The Court may look beyond the pleadings and consider any evidence submitted to determine whether jurisdiction exists. *Long*, 182 F.3d at 554.

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff, accepts the factual allegations as true, and draws all

reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raise a right to relief above the speculative level, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).[2]

## II.   The Court does not have jurisdiction under *Ex parte Young*

First, the Court must determine whether it has jurisdiction over this case keeping in mind the relevant abstention doctrines and recognizing state sovereign immunity. The Eleventh Amendment to the Constitution states that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Eleventh Amendment immunity was also extended to protect states from suits brought by their own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 13–15 (1890). A state's Eleventh Amendment immunity also normally bars suits against the state and state agencies for

---

[2] "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion. Under Rule 12(b)(6), by contrast, the defendant bears the burden of demonstrating the plaintiff has not stated a claim." *J.F. New & Assocs., Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, ALF-CIO*, No. 3:14-CV-1418 RLM, 2015 WL 1455258, at *7 (N.D. Ind. Mar. 30, 2015) (quoting *Rogers v. United States,* No. 1:08–CV–162, 2009 WL 482364, at *2 (N.D. Ind. Feb.23, 2009)).

equitable relief. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Moreover, Courts commonly consider state officials in their official capacities to be acting on behalf of the state, and, therefore, the Eleventh Amendment shields them from lawsuits. *See Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985); *Pennhurst,* 465 U.S. at 101–02.

Here, the Plaintiffs allege that the Indiana Supreme Court's decision in *Gunderson* and its subsequent codification by the Indiana legislature were, in effect, a taking of their private property without just compensation.[3] "The Takings Clause—nor shall private property be taken for public use, without just compensation, U.S. Const., Amdt. 5—applies as fully to the taking of a landowner's riparian rights as it does to the taking of an estate in land." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010) (citing *Yates v. Milwaukee,* 10 Wall. 497, 504, 19 L.Ed. 984 (1871)). Plaintiffs seek to prohibit Indiana State officials from enforcing the boundary determined by the *Gunderson* court and the alleged expansion of the easement established by HEA 1385. In reality, by asking the Indiana State officials to not enforce the boundary determined by the *Gunderson* decision, the Plaintiffs are

---

[3] The Court would first note that it may take judicial notice of the *Gunderson* decision. "The Court may take judicial notice of matters of the public record, including court records, on a motion to dismiss brought under Rule 12(b)(1) or an abstention doctrine." *Miller v. Balterman*, No. 18-CV-4353, 2018 WL 6511145, at *1 n.1 (N.D. Ill. Dec. 11, 2018) (citing *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (allowing a district court ruling on a 12(b)(1) motion to " 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists' "); *Lumen Const., Inc. v. Brant Const. Co.*, 780 F.2d 691, 697 n.4 (7th Cir. 1985) (finding that "the official record of the parallel state case is a proper object for judicial notice" on a motion to abstain)).

The Court would then note that the Rooker-Feldman doctrine does not apply to this case as the parties are not the same as those in the *Gunderson* case: the plaintiffs in this case are similarly situated landowners who were not a party to the original case, *see Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 728 (2010) (plurality), and they are not the same party who lost in state court. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005) (applying the doctrine when "the losing party in state court filed suit in federal court *after* the state proceedings ended."); *see also* Dustin E. Buehler, Revisiting Rooker-Feldman: Extending the Doctrine to State Court Interlocutory Orders, 36 Fla. St. U. L. Rev. 373, 414 (2009) ("An independent federal claim will foreclose application of the Rooker-Feldman doctrine even if it 'denies a legal conclusion that a state court has reached.'") (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). Moreover, "[t]he *Rooker–Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance v. Dennis*, 546 U.S. 459, 466 (2006).

asking this Court for exclusive title to the property below the OHWM. Traditionally, if the state officials are acting within the authority of state law and are not violating federal law, then their actions are protected by the Eleventh Amendment. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 696–97 (1982).

But the analysis changes if state officials are violating federal law. Under the narrow exception created by the Supreme Court in *Ex parte Young*, any action on the part of state officials that violates federal law cannot be attributed to the state. 209 U.S. 123, 159–60 (1908). "The *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (O'Connor, J., concurrence) (citing *Ex parte Young*, 209 U.S. at 159–160). Thus, under the *Ex parte Young* exception, "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102. The plaintiffs argue that this case falls within the *Ex parte Young* exception and therefore this Court has jurisdiction to decide it. This Court therefore must determine whether the *Ex parte Young* exception applies here.

### A.  The Ex parte Young *Inquiry*

Instead of completing a case-by-case analysis to determine whether a claim falls within the *Ex parte Young* exception as was espoused by Justice Kennedy in the plurality opinion in *Coeur d'Alene*, the Supreme Court later clarified in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002), that courts should complete a simpler assessment to determine whether the exception applies. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a

'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id*. (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring)). In cases implicating the Eleventh Amendment and *Ex parte Young*, the Seventh Circuit has applied the straightforward inquiry when determining whether a case fell within the exception. In *Ameritech Corporation v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002), the Seventh Circuit noted that the Supreme Court had "helped define precisely when the *Ex Parte Young* exception applies . . ." before quoting the straightforward inquiry from *Verizon*. It again reaffirmed this approach in *Indiana Protection and Advocacy Services v. Indiana Family and Social Services*, 603 F.3d 365, 371 (7th Cir. 2010), finding that the Supreme Court had moved away from the balancing approach described in *Coeur d'Alene* and instead courts were to follow the straightforward inquiry espoused in *Verizon*.

When applying the "straightforward inquiry" clarified in *Verizon*, this case seemingly falls within the *Ex parte Young* exception. First, since the Plaintiffs are alleging an ongoing violation of a federal right, they meet the first requirement. The Plaintiffs allege that the Indiana Supreme Court's decision in *Gunderson* and the legislature's subsequent codification of the decision effectively moved their property line back to the OHWM despite their historical exclusive title to the low water mark. They argue the determination that the State of Indiana holds exclusive title below the OHWM constituted a taking of private property without just compensation in violation of the Constitution. When completing the analysis under the *Ex parte Young* exception, courts are to look at the allegations of the claim and not consider the underlying merits. *Tindal v. Wesley,* 167 U.S. 204, 216 (1897) ("It is to be presumed in favor of the jurisdiction of the court that the plaintiff may be able to prove the right which he asserts in his declaration"); *see also*, *Verizon Maryland*, 535 U.S. at 646 ("But the inquiry into whether suit

lies under *Ex parte Young* does not include an analysis of the merits of the claim."). Since the plaintiffs have alleged an ongoing federal violation, they meet the first requirement under *Ex parte Young*.

Second, the Plaintiffs are seeking prospective relief, and more specifically they are seeking to enjoin Indiana officials from continuing to enforce the boundary line that resulted from the *Gunderson* decision. The Plaintiffs are not seeking any damages or other retrospective relief that would result in the inapplicability of the *Ex parte Young* exception. As the Plaintiffs explain, an injunction would not entitle them to any monetary relief in state court but would prevent State officials from enforcing the *Gunderson* boundaries and permit them to resume the use of their property. [DE 45 at 24]. The Plaintiffs "simply want the Court to stop the allegedly unconstitutional taking and restore the status quo ante *Gunderson*." [*Id.*]. Thus, since the Plaintiffs seek relief that is properly characterized as prospective, they meet the second requirement under *Ex parte Young*.[4]  The straightforward inquiry under *Ex parte Young* would seem to result in the Court having jurisdiction over the plaintiffs' claims.

   B.  *A narrow exception to* Ex parte Young

But the Plaintiffs' ultimate request—for this Court to restore the alleged status quo property boundary line on the shores of Lake Michigan—raises difficult issues of federalism and comity as it requires this Court to effectively overturn a State Supreme Court decision and grant plaintiffs exclusive title to the land below the OHWM. Here, this Court believes that this is a unique case, which parallels the issues presented in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521

---

[4] The Defendants assert that only the Director of the State of Indiana Department of Natural Resources ("DNR") is a proper party to the suit under *Ex Parte Young*. The Plaintiffs respond that "[w]hether the remaining Defendants are properly sued is irrelevant to the outcome." [DE 45 at 2]. The Court agrees with the Defendants that since the Plaintiffs are seeking injunctive relief, the case may only proceed against the State employees with enforcement power, which in this case is the Director of the DNR.

U.S. 261 (1997). In *Coeur d'Alene*, the Supreme Court noted that "[a]n allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *Id*. at 281. But they also found the *Ex parte Young* exception to be inapplicable as the Tribe's suit was "the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id*. As the Supreme Court observed, it had to determine the effect of the Tribe's suit and its impact on special sovereignty interests of the state before deciding whether to apply the exception in *Ex parte Young*. The Supreme Court found that the declaratory and injunctive relief sought by the Tribe was "close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe." *Coeur d'Alene*, 521 U.S. at 282. The Supreme Court's holding in *Coeur d'Alene* was unique in that it found the state's special sovereignty interests in the land in dispute were significant enough for the case to be treated as an exception to the *Ex parte Young* exception. Since the plaintiffs in *Coeur d'Alene* were seeking the functional equivalent of a quiet title suit against the state, the Supreme Court found that it could not fall within the exception to a state's sovereign immunity under the Eleventh Amendment.[5] 521 U.S. at 281–82, 287–88.

Here, the Plaintiffs are seeking something similar. By requesting that this Court restore the alleged status quo and prevent Indiana state officials from enforcing a boundary line recently clarified by the Indiana Supreme Court and codified by the Indiana legislature, the Plaintiffs are effectively seeking relief equivalent to a quiet title action.[6] The Plaintiffs' suit seeks to

---

[5] In her concurrence, Justice O'Connor also noted that "[w]here a plaintiff seeks to divest the State of all regulatory power over submerged lands—in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands—it simply cannot be said that the suit is not a suit against the State." *Coeur d'Alene*, 521 U.S. at 296.

[6] In *Gunderson*, the Indiana Supreme Court held that "Indiana at statehood acquired equal-footing lands inclusive of the temporarily-exposed shores of Lake Michigan up to the natural OHWM." 90 N.E.3d at 1181. The Plaintiffs argue that the boundary line between the public trust along the shore of Lake Michigan and upland private property is at the low water mark. Thus, the title action relates to the land between the low water mark and the OHWM.

extinguish Indiana's ownership and, as a result, diminish its control of the shores of Lake Michigan.[7] Thus, this Court believes that the facts of this case place it squarely within the reach of *Coeur d'Alene*. While there is some friction between the Supreme Court's direction to conduct a straightforward inquiry and the exception established in *Coeur d'Alene*, the Supreme Court has not overturned *Coeur d'Alene*. In fact, several years later, the Supreme Court affirmed *Coeur d'Alene* in *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 258 (2011) ("*VOPA*"), when it noted the case before it did not threaten an invasion of Virginia's sovereignty and recognized that "[t]he specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent . . . . [which] effectively occurs . . . when (for example) the object of the suit against a state officer is to reach funds in the state treasury or acquire state lands . . . ." Thus, the Supreme Court specifically noted that cases involving the acquisition of state lands is a unique situation where the State's dignity may be offended. Finally, in *VOPA*, the Supreme Court noted its willingness "to police abuses of the doctrine that threatens to evade sovereign immunity." *Id*. at 256.

As explained above, the Seventh Circuit recognizes the need for a straightforward inquiry under *Ex parte Young*. However, *Ameritech* and *Indiana Services* can be distinguished because they did not involve special state land interests such as those at issue in this case. The cases also pre-dated *VOPA* during a time when the significance and reach of *Coeur d'Alene* may have been in doubt following the Supreme Court's statements in *Verizon*. While the Seventh Circuit stated in *Ameritech* that courts were to carry out the straightforward inquiry from *Verizon* and "not

---

[7] Plaintiffs state in their brief: "Plaintiffs can no longer use and enjoy this property. They are now limited to the same rights the general public possesses. While Plaintiffs have no issue with the public walking across the beach pursuant to walking easements they have conveyed, *Gunderson*'s decree extinguished their ownership of the beach and the many rights that come with it." [DE 45 at 1].

assess the precise nature of the State's sovereign interest in law enforcement—so long as [the plaintiff's] complaint seeks prospective injunctive relief to cure an ongoing violation of federal law," this Court believes that consistent with *Coeur d'Alene* and *VOPA*, it still needs to consider a state's special sovereignty interests when state land is at issue. 297 F.3d at 588. Sitting en banc in *Indiana Protection*, the Seventh Circuit distinguished *Coeur d'Alene* as an unusual case noting that "it would decide the state's ownership and legal and regulatory authority over a vast reach of lands and waters long deemed by the State to be an integral part of its territory." 603 F.3d at 372 (quotation omitted). Here, the plaintiffs are not contesting the state's legal or regulatory authority over the disputed land, but they are contesting the ownership of it. Nonetheless, their ownership of the property would, to some extent, impact the state's ability to control that property.

Moreover, neither *Ameritech* nor *Indiana Services* involved an issue related to state land. In *Ameritech*, the plaintiff sought a declaration that the defendant must comply with certain provisions of the Electronic Communications Privacy Act. 297 F.3d at 588. *Indiana Services* addressed the issue of whether the plaintiff could access the records of two mentally ill patients in a state hospital. In both cases the Seventh Circuit specifically noted the uniqueness of *Coeur d'Alene* and found it inapplicable based on the facts before it, but this Court does not find that reasoning to be dispositive as the allegations of this case bring it considerably closer to the holding in *Coeur d'Alene*. As was demonstrated in *VOPA*, the Supreme Court itself continues to treat *Coeur d'Alene* differently and notes that its uniqueness brings it outside of the straightforward inquiry of whether a case falls under the *Ex parte Young* exception.

Additionally, other circuits have acknowledged that *Coeur d'Alene* is applied differently due to the special sovereignty issues presented in the case. In *Lacano Investments, LLC v. Balash*, 765 F.3d 1068, 1074 (9th Cir. 2014), the Ninth Circuit recognized that *Coeur d'Alene*

was still binding law and that *Verizon* did not overrule it. In *Lacano*, owners of land patents issued by the federal government before Alaska entered the Union argued that the patents gave them title to certain streambeds in Alaska. The plaintiffs sought a declaratory judgment that Alaska DNR's navigability determinations violated the Submerged Lands Act and an injunction prohibiting the defendants from claiming title to the lands beneath the waterways. The Ninth Circuit explained, "[t]o the extent there is some tension between the 'straightforward inquiry' recognized in *Verizon* and the 'unique' and 'narrow' circumstances of *Coeur d'Alene,* we must follow *Coeur d'Alene,* 'which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" *Lacano*, 765 F.3d at 1074 (citation omitted). The Ninth Circuit also found that "Federal courts lack jurisdiction over all actions where a plaintiff seeks relief that is 'close to the functional equivalent of quiet title' over submerged lands that have a 'unique status in the law' and which are 'infused with a public trust.'" *Id*. at 1076.

More recently, the Third Circuit recognized the Supreme Court's willingness "to police abuses of the [*Ex parte Young*] doctrine that threaten to evade sovereign immunity because the relief would operate against the State." *Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 239 (3d Cir. 2020) (citing *VOPA*, 563 U.S. at 256) (quotation omitted). In *Waterfront*, the Waterfront Commission sued the Governor of New Jersey to prevent him from terminating a compact made with the State of New York more than fifty years prior. The Third Circuit found that, since the State of New Jersey was the real, substantial party in interest, the federal courts did not have jurisdiction. The Third Circuit noted numerous cases where the Supreme Court found that the sovereign was the real, substantial party in interest, including in *Coeur d'Alene*, where quiet title to and preclusion of state control of territory within the State's regulatory jurisdiction would be "as intrusive as almost any conceivable retroactive levy upon

12

funds in its Treasury." *Id*. at 239 (quoting *Coeur d'Alene*, 521 U.S. at 281–82). These cases from other circuits demonstrate that *Verizon* did not abrogate or limit *Coeur d'Alene* but that it continues to be applicable and it is not a good-for-one-case-only rule.[8]

### C.   Applying Coeur d'Alene *to the Facts of this Case*

As the Supreme Court recognized in *Coeur d'Alene*, "[t]he question before us is not the merit of either party's claim, however, but the relation between the sovereign lands at issue and the immunity the State asserts." 521 U.S. at 287. As addressed at length in the *Gunderson* decision and many federal cases before this one, the lands underlying navigable waters have historically been considered sovereign lands. Under the Equal Footing Doctrine, courts have recognized this land as an essential attribute of sovereignty. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 373–74 (1977). The court found that "the boundary between the upland and tideland was to be determined by federal law" but "thereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State." *Id*. at 378. Moreover, the Supreme Court previously found that the Public Trust Doctrine—the common-law tradition that the state, as sovereign, acts as trustee of public rights in natural resources—applies to the Great Lakes. *Ill. Cent. R. Co. v. Ill.,* 146 U.S. 387, 436–37 (1892). In this case, the land at issue is not submerged but is the land between the low water mark and the OHWM on the shores of Lake Michigan.

While this Court recognizes that there are factual differences between this case and *Coeur d'Alene*, it finds that there are sufficient similarities for this case to fall within the

---

[8] This Court recognizes that the Tenth Circuit limited the reach of *Coeur d'Alene*, but again, that was following the Supreme Court's holding in *Verizon* and prior to its findings in *VOPA*. *See Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 912 (10th Cir. 2008) (noting that the Supreme Court limited the reach of *Coeur d'Alene Tribe* by not including the issue of sovereignty as part of a court's analysis regarding Eleventh Amendment immunity). In *Tarrant* the plaintiff, a Texas agency responsible for supplying public water, claimed that an Oklahoma law unconstitutionally prevented it from appropriating or purchasing water located in Oklahoma. Since the Seventh Circuit has not clearly limited *Coeur d'Alene*'s reach, this Court still finds it to be applicable to the facts of this case.

exception recognized in *Coeur d'Alene*. While the Tribe in *Coeur d'Alene* sought to establish ownership over a vast area of land in Idaho (the submerged lands of Lake Coeur d'Alene in addition to various rivers and streams within the boundaries of the reservation) and here the Plaintiffs are seeking a determination of a much smaller amount of land (their lots specifically, but could be expanded to potentially 45 miles of shore land), sovereignty issues are still implicated regardless of the amount of land in question. The Plaintiffs also attempt to distinguish this case from *Coeur d'Alene* by pointing out that the sovereignty issues were related to a Tribe and a State (not citizens of a State and a State) and that the Tribe sought relief that went further than the relief requested here. This Court recognizes that when tribes are involved in a dispute, there are unique sovereignty issues implicated, but other courts have applied the holding in *Coeur d'Alene* even where a tribe was not involved, i.e., *Lacano* and *Waterfront*. Given that state sovereignty issues carry over in non-tribal contexts as well, this Court does not find the absence of a tribal party decisive here.

Finally, the Plaintiffs argue that they are not seeking to completely divest Indiana of its sovereignty or jurisdiction over the disputed property as the Tribe did in *Coeur d'Alene.* The Tribe in *Coeur d'Alene* certainly went further than the plaintiffs in this case, as the plaintiffs seem to still recognize that the property below the OWHM is encumbered by the public trust. [DE 45 at 26 n.11 "Plaintiffs take no position on the existence of a public trust on privately owned land lakeward of the OWHM. Plaintiffs simply note that private ownership and the public trust can indeed be incompatible."]. But as the Plaintiffs also recognize, the only portion of the Supreme Court's opinion in *Coeur d'Alene* "that commanded a majority held *Young* inapplicable because the Tribe's suit was 'the functional equivalent of a quiet title action which implicates special sovereignty interests.'" [DE 45 at 25 quoting *Coeur d'Alene*, 521 U.S. at 218]. The

essence of this suit is a dispute between the plaintiffs and the State of Indiana over exclusive ownership of the land between the low water mark and the OHWM on the shores of Lake Michigan. Plaintiffs' request strikes at the heart of special sovereignty interests as it requires the determination of exclusive title as to where State property ends and private property begins. Even setting aside the argument that the plaintiffs aren't contesting Indiana's legal or regulatory authority over the land, this Court still finds the allegations fall within the *Coeur d'Alene* exception as their claim directly implicates ownership and control of the land. If this Court were to grant the Plaintiffs' request, the benefits of ownership and control would shift from the State of Indiana to the plaintiffs. The Eleventh Amendment bars this kind of action.

"This is especially true when, as in the case before us, the controversy involves not simply a violation of federal law, but relief impacting the validity of an asserted state property interest." *Elephant Butte Irr. Dist. of N.M. v. Dep't of Interior*, 160 F.3d 602, 608–09 (10th Cir. 1998) (recognizing that *Coeur d'Alene* imposed a new requirement on federal courts and considered whether the relief sought by the plaintiff implicated special sovereignty interests); *see also MacDonald v. Vill. of Northport*, 164 F.3d 964, 971–72 (6th Cir. 1999) (When the plaintiffs sought a declaration that they owned a right-of-way which provided access to a navigable waterway, the Sixth Circuit applied *Coeur d'Alene Tribe* and found that "[b]ecause the state of Michigan has a great interest in maintaining public access to the Great Lakes, the MacDonalds' requested relief implicated 'special sovereignty interests.'" The Circuit abstained on other grounds under the Burford Abstention.); and *Anderson-Tully Co. v. McDaniel*, 571 F.3d 760, 763 (8th Cir. 2009) (applying *Coeur d'Alene* where the landowner sought quiet title to two bodies of water in Arkansas and concluding that the Eleventh Amendment barred the federal lawsuit). Finally, the Supreme Court has recognized "the need to promote the supremacy of federal law"

while also accommodating "the constitutional immunity of the States." *Pennhurst*, 465 U.S. at 105. That balance must be struck here.

Courts must be "willing to police abuses of the [*Ex parte Young*] doctrine that threaten to evade sovereign immunity." *VOPA*, 563 U.S. at 256. This case threatens an invasion of Indiana's sovereignty, and this Court finds that it does not fall within the *Ex parte Young* exception. Allowing this suit in federal court would have a direct effect on the sovereignty and autonomy of the State of Indiana, which deprives this Court of jurisdiction to hear it. Therefore, following the Supreme Court's lead in *Coeur d'Alene*, as reaffirmed in *VOPA*, this Court finds that due to the special sovereignty interests presented by this case, most notably the exclusive title action sought by the Plaintiffs, the *Ex parte Young* exception is inapplicable here and the suit is barred by the Eleventh Amendment's state sovereign immunity protection.

### III.   There is no cognizable claim for which relief may be granted

Even if this Court were to find that the Plaintiffs' claim fell within the *Young* exception, the Court would find there to be no cognizable claim here.[9] While the parties more directly address the concept of judicial takings in their briefs, because the Indiana legislature codified the *Gunderson* holding in HEA 1385, the Court need not determine whether a court's decision can constitute an unjust taking of property. After all, the Plaintiffs allege that "[w]ith respect to ownership, HEA 1385 essentially codified the Gunderson rule" and adopted the court's position that they never owned the property described in their deeds. [DE 37 at 25]. But no matter

---

[9] District courts regularly address arguments made under Rule 12(b)(6), even after granting a motion under 12(b)(1). *See Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1120 (S.D. Ind. 2011) ("Even if Plaintiffs had established injury sufficient to confer standing, we would nevertheless dismiss this action because they have not stated any claim upon which relief can be granted."), and *Jimenez v. Illinois*, No. 11-CV-4707, 2012 WL 174772, at *5 (N.D. Ill. Jan. 18, 2012), aff'd sub nom. *Jimenez v. Waller*, 498 F. App'x 633 (7th Cir. 2012) ("Even if jurisdiction could be established, Plaintiffs' claims are dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.").

through which lens this Court reviews the Plaintiffs' allegations, the complaint still fails to state a claim because the Plaintiffs cannot show a legal entitlement to the land in question.

Under the judicial takings theory, assuming the concept is a viable one, Plaintiffs have to plausibly allege "whether the property right allegedly taken was established." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 728 (2010) (Scalia, J., concurrence)*;*[10] *see also Stevens v. City of Cannon Beach*, 510 U.S. 1207, 114 S.Ct. 1332, 1334 (1994) (Scalia, J., dissenting from the denial of certiorari) ("As a general matter, the Constitution leaves the law of real property to the States. But just as a State may not deny rights protected under the Federal Constitution through pretextual procedural rulings . . . neither may it do so by invoking nonexistent rules of state substantive law."); *Knick v. Twp. of Scott, Pennsylvania*, 139 S.Ct. 2162, 2187 (2019)[11] (Kagan, J., dissenting) (before any federal constitutional standards "can come into play, a court must typically decide whether, under state law, the plaintiff has a property interest in the thing regulated") (citing *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)); *see also* Stewart E. Sterk, <u>The Demise of Federal Takings Litigation</u>, 48 Wm. & Mary L. Rev. 251, 288 (2006) ("[I]f background state law did not recognize or create property in the first instance, then a subsequent state action cannot take property."). The Court notes, of course, that no binding precedent on the concept of judicial takings was established in any of these cases as only four justices endorsed the concept in *Stop the Beach* and "because no controlling principle can be gleaned from the plurality, concurrence . . . and the dissenting opinions." *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 615 (7th Cir. 2014). Thus, a court faced

---

[10] Notably, the concurrences in *Stop the Beach Renourishment* declined to address the question of whether court decisions could amount to a judicial taking. *Id*. at 737, 745.

[11] This case also over-ruled the previous requirement established in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), that takings plaintiffs must first appeal their takings claim to the state supreme court.

with the question of whether a state supreme court effected a taking must look to the pre-existing state law and address whether the property right was established in that law. Here, this Court must consider Indiana law and whether the Plaintiffs' property right to the area of land between the low water mark and the OHWM on the shores of Lake Michigan was well-established and then changed or, if the Indiana Supreme Court merely clarified and elaborated on the pre-existing property right.[12]

In *Stop the Beach,* Justice Scalia emphasized that the State cannot invoke nonexistent rules of state substantive law or change an established property right. 560 U.S. at 731. The Court finds that nothing like that happened here; rather, there is sufficient legal precedent prior to *Gunderson* that demonstrates the Indiana Supreme Court in *Gunderson* did not change the law concerning the Plaintiffs' properties in question. And, at the very least, the Court would find there was significant ambiguity in that field of property law and that the *Gunderson* decision did not represent a radical departure from a well-established or even well-understood property right. Plaintiffs submit that their deeds for the beachfront parcels include property below the OHWM and down to the water's edge. [DE 37 at 9]. The Plaintiffs assert that they conveyed walking easements along their property to the U.S. government, but explicitly reserved all rights in the property other than walking. [*Id*. at 11]. The Plaintiffs provide several other historical accounts, which describe how a good portion of the Indiana shoreline was privately held. [*Id*. at 12–19]. While the Plaintiffs supply historical background on beachfront parcels in Indiana to support their assertion that they have always owned the land down to the water's edge, the Court finds

---

[12] The Court focuses on the *Gunderson* decision as it is where the state defines the source of the property interest. The Supreme Court has recognized that neither the state legislature, nor the state courts may transform private property into public property without compensation. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980).

these accounts only serve to demonstrate the property-owners' confusion surrounding the issue in Indiana.

As explained in *Gunderson*, "[t]he State of Indiana, upon admission to the Union in 1816, acquired title to the shores and submerged lands of all navigable waters within its borders." 90 N.E.3d at 1177 (citing *State ex rel. Ind. Dep't of Conservation v. Kivett*, 228 Ind. 623, 630 (1950)). The federal patent at the root of the Gundersons' deed did not convey any land below the OHWM. *Id*. at 1179. The Supreme Court has long recognized that title to land below the high-water mark was governed by state law:

> The new states admitted into the Union since the adoption of the constitution have the same rights as the original states in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below (the) high-water mark, therefore, are governed by the laws of the several states, subject to the rights granted to the United States by the constitution.

*Shively v. Bowlby*, 152 U.S. 1, 57–58 (1894). *Shively* ultimately held that "[g]rants by congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below [the] high-water mark, and do not impair the title and dominion of the future state." *Id*. at 58. And it was recognized that the shores or space between the OHWM and low water marks was held by the State for the benefit of the people of the state. *Lake Sand Co. v. State*, 120 N.E. 714, 716 (1918) (quoting *Ex parte Powell*, 70 Fla. 363, 372 (1915)). Moreover, American common law defined the boundary at the OHWM and not wherever the water's edge was at a given moment in time. *See Gunderson*, 90 N.E.3d at 1179. Finally, it is consistent with historical authority that "lands on the waterbody side of the OHWM pass to new states as an incident of sovereignty, whereas lands on the upland side of the OHWM are available for federal patent and private ownership." *Id*. at 1180. Thus, the *Gunderson* court found that the grant of land by Congress to the states

included property up to the OHWM and that the land between the OHWM and the low water mark was held in the public trust by the State of Indiana. "But it has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 475 (1988).

Finding that the State of Indiana acquired exclusive title to the shores of Lake Michigan up to the natural OHWM, the *Gunderson* court then determined that the State of Indiana had not relinquished title to that land at any point in its history. The Gundersons had argued that their property extended to the water's edge because Indiana had surrendered its public trust rights in Lake Michigan. 90 N.E.3d at 1182. But the Indiana Supreme Court found that Indiana had not relinquished its title or surrendered its public trust rights to the shores of Lake Michigan. *Id*.

The *Gunderson* court analyzed the scope of the public trust doctrine in Indiana and found that the common-law public trust doctrine still applied to Lake Michigan even though it was excluded in the 1947 Indiana Acts 1223 (codified as amended at Ind. Code § 14-26-2-5), which determined the scope of public rights on lakes in Indiana. *Id*. at 1183. The *Gunderson* court also found that, even if the Indiana legislature had intended to extinguish those public trust rights, it lacked the authority to do so. *Id*. at 1183 (quoting *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 453 (1892). ("The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.").[13] Additionally, the court found that under several provisions of the Indiana Code,

---

[13] Land that the state holds in the public trust cannot be relinquished by a transfer of the property. "It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Illinois Cent.*, 146 U.S. at 452.

land bordering Lake Michigan remained encumbered by the public trust, which limited Indiana's ability to transfer or relinquish it.[14] *Id.* And it was recognized that the shores or space between the OHWM and low water marks was held by the State for the benefit of the people of the state. *Lake Sand Co. v. State*, 120 N.E. 714, 716 (1918) (quoting *Ex parte Powell*, 70 Fla. 363, 372 (1915)). The *Gunderson* court ultimately recognized that "*at a minimum*, walking below the natural OHWM along the shores of Lake Michigan is a protected public use in Indiana." 90 N.E.3d at 1188. Thus, the area in dispute in this case directly overlaps with the area that Indiana holds in the public trust for its citizens. Thus, even if the State of Indiana had ceded exclusive title to the land below the OHWM, the State still held that land in the public trust for its citizens and, therefore, at a minimum, the property owners did not have exclusive control of that area. But ultimately, the Indiana Supreme Court *did* find that Indiana had exclusive title to the land below the OHWM and that it held that land in the public trust for all citizens of Indiana to enjoy.

Notably, the *Gunderson* court did find that a set of Indiana cases addressing title to property along the Ohio River did not apply to the shores of Lake Michigan as was argued by the Gundersons.[15] The line of Indiana cases found that the title of riparian owners along the Ohio river extended to the low-water mark. The *Gunderson* court found that the rule had "no application to other equal-footing lands within Indiana, including the shores of Lake Michigan." 90 N.E.3d at 1184. The *Gunderson* court also noted that to the extent the holding in *Bainbridge*

---

[14] The Court explained that under Indiana's submerged property statute, even if a person acquired title to submerged real property adjacent to Lake Michigan and filled it in or made improvements to it, the land remained encumbered by the public trust. "Before issuing a permit under Indiana Code chapter 14–29–1 (a requisite step under the submerged property statute), the DNR "shall consider [the] public trust" and the "likely impact upon the applicant and other affected persons, including the accretion or erosion of sand or sediments." 312 Ind. Admin. Code 6–1–1(f) (2017)." 90 N.E.3d at 1183.

[15] *Bainbridge v. Sherlock*, 29 Ind. 364 (1868); *Stinson v. Butler*, 4 Blackf. 285, 285 (1837); *Handly's Lessee v. Anthony*, 18 U.S. (5 Wheat.) 374, 383, 5 L.Ed. 113 (1820); *Martin v. City of Evansville*, 32 Ind. 85, 86 (1869); *Irvin v. Crammond*, 58 Ind. App. 540, 108 N.E. 539, 541 (1915).

generated reliance interests in land extending to the low water mark, the Indiana Supreme Court had subsequently narrowed it by adopting a more expansive view of public trust rights along the Ohio river in *Martin v. City of Evansville*, 32 Ind. 85, 86 (1869), finding instead that the city could regulate the area below the high-water mark. *Id*. at 1184. The *Gunderson* court concluded that "the natural OHWM is the legal boundary separating State-owned public trust land from privately-owned riparian land" on the shores of Lake Michigan. *Id*. at 1187. This Court agrees that *Gunderson* was not declaring what "had been private property under established law no longer is" but rather that its decision was clarifying property entitlements that had been previously unclear. 90 N.E.3d at 1185 (citing *Stop the Beach*, 560 U.S. at 728).[16]

In short, the *Gunderson* decision was not a sudden change in state law regarding a well-established property right. *Gunderson* recognizes that some of the rules created for property lying next to navigable water were developed over time and many were created for property sitting next to rivers and not lakes. *Gunderson* clarified that a set of cases relevant to the Ohio River in Indiana did not apply to property along Lake Michigan. The Indiana Supreme Court in *Gunderson* did not, as Justice Scalia warned in *Stevens v. City of Cannon Beach*, 114 S.Ct. 1332 (1994), invoke nonexistent rules of state substantive law, but instead reviewed the history of land grants and the presence of the public trust along the shores of Lake Michigan to determine where the boundary had always been. Thus, *Gunderson* did not transform private property into public property but clarified where the boundary of the public trust had always existed along the shores of Lake Michigan. Moreover, the *Gunderson* decision is not a radical departure from previously

---

[16] And similar to the plaintiffs in *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 482 (1988), despite the reliance interests that may have developed over time as a result of the deeds and paid taxes on these parcels of land on Lake Michigan, here, Indiana law demonstrates that the state has always held title below the OHWM and has also always held the land in the public trust for its citizens. "These statements [] should have made clear that the State's claims were not limited to lands under navigable waterways. Any contrary expectations cannot be considered reasonable." *Id*. at 481.

well-established property law in Indiana. At best, the area of property law was murky in the State of Indiana, and, likely, even murkier on the shores of Lake of Michigan. Without a clearly established property interest in the land, the subsequent state clarification—either by the judiciary or the legislature of where the boundary between state and private property and where the public trust had always existed since Indiana joined the Union in 1816—cannot be considered a taking.

Therefore, even if it had jurisdiction over this case, this Court would find that the Plaintiffs have no claim for takings following the *Gunderson* decision and would grant Defendants' motion to dismiss under Rule 12(b)(6). Since the Plaintiffs recognized in their response brief that their second cause of action, based on the expanded easement established by HEA 1385, is conditional upon the success of its first cause of action (the takings claim) [DE 45 at 29], the Court will not address the remaining cause of action.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS the Defendants' motion to dismiss for lack of subject matter jurisdiction. [DE 40]. Due to this case being dismissed for the lack of subject matter jurisdiction, the remaining motion pending at DE [53] is now MOOT. Accordingly, the Plaintiffs' claims before this Court are DISMISSED.

SO ORDERED

ON: March 31, 2021


/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT